BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
David T. Wissbroecker (SBN 243867)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: 858-914-2001
Facsimile: 858-914-2002
fbottini@bottinilaw.com
dwissbroecker@bottinilaw.com

*Counsel for Plaintjff*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| PHIL ROSEN, derivatively on behalf of APPLE INC., | No. |
| Plaintiff, | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| TIM COOK, ART LEVINSON, WANDA AUSTIN, ALEX GORSKY, ANDREA JUNG, MONICA LOZANO, RON SUGAR, SUE WAGNER, KEVAN PAREKH, LUCA MAESTRI, KATE ADAMS, SABIH KHAN, JEFF WILLIAMS, and DEIRDRE O'BRIEN, | |
| Defendants, and | |
| APPLE INC., Nominal Defendant. | |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Phil Rosen ("Plaintiff"), derivatively on behalf of Apple Inc. ("Apple" or the "Company") alleges the following based on personal knowledge as to Plaintiff and Plaintiff's acts and as to all other matters on information and belief based on the investigation of Plaintiff's counsel, which included, among other things, a review of legal and regulatory filings, press releases, Apple's online documents, media reports about Apple and other public statements issued by the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a stockholder derivative action brought by plaintiff on behalf of Apple against certain of its officers and directors for adopting and implementing an unlawful business strategy whereby Apple used copyrighted and unlicensed materials, including books, videos, and commercial voices, to develop its Artificial Intelligence ("AI") services.

2. Apple is a company that designs, manufactures and markets smartphones, personal computers, tablets, wearables and accessories, and sells a variety of related services. Apple has engaged in setting up AI platforms via Apple Intelligence models, which include a set of generative AI programs and technologies designed and maintained by Apple.

3. Apple Intelligence models include multiple AI software programs called large language models ("LLMs") created, maintained, and commercialized by Apple. Apple's LLMs include the OpenELM and the Foundation Language Models. Apple trained its Apple Intelligence OpenELM language models and its Foundation Language Models using the Books3 pirated dataset, which included approximately 196,640 pirated books.

4. A large quantity of the dataset used for pre-training OpenELM comes from the Books3 subset of the RedPajama dataset, hosted on "Hugging Face." A major source of training data for Apple's Foundation Language Models also includes Books3, and filtered Applebot web pages with copyrighted works from commercial news and media websites.

- 1 -
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

5.      Apple Intelligence models and platforms also include Vision-Language Models ("VLMs"), Apple AI Video, a set of large-scale generative text-to-video AI models.  Apple trained Apple AI Video on Panda-70M, a derivative dataset of HD-VILA-100M, compiled by Snap, Inc., and derived from YouTube videos extracted from YouTube through circumvention of YouTube's technological protection measures ("TPMs").  Panda-70M was compiled from 3,098,462 YouTube videos, which consists of approximately 70.8 million video clips, extracted without authorization from YouTube or the copyright holders whose works were contained in YouTube.

6.      AI models also include the training and deployment of generative AI models, voice synthesis, voice cloning, and voice-conversion models, that developed multiple commercial voice models ("CVMs") for Apple's commercial voice AI products.  Apple distributes these CVMs through Touch ID, Face ID, Personal Voice, App Tracking Transparency, Secure Enclave, and Private Cloud Compute. These CVMs include Siri, Personal Voice, Live Speech, "Narrated by Apple Books," Dictation, Voice Memos transcription, Live Voicemail, and iMessage audio-message transcription, and SFSpeechRecognizer and SpeechAnalyzer.  Apple ingested within each of these CVMs hundreds of thousands of hours of human speech recordings and extracted the unique biometric signatures and the voiceprints of the speakers from those recordings.  In violation of the Illinois Biometric Information Privacy Act ("BIPA"), the Defendants failed to identify the source speakers, provide written notice of the specific purpose and duration of collection, and obtain a written release from each speaker before ingesting that speaker's recording into the training pipeline, which resulted in damages to the source speakers.

7.      Defendants are all directors and/or officers of Apple and knew of the copyright and BIPA violations being perpetrated through Apple's OpenELM, the Foundation Language Model, Apple AI Video, and CVMs.  Rather than utilize a clean dataset that did not include copyrighted works and commercial voices, Defendants followed the "ask forgiveness not approval" model and adopted and implemented an unlawful plan to use pirated datasets to develop the Company's AI services.  Defendants'

- 2 -

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

misconduct constitutes bad faith and a violation of privacy law in directing, approving, or permitting the misconduct.

8. Defendants' misconduct has resulted in multiple copyright holders and commercial voice persons filing lawsuits against Apple based on Apple's failure to compensate them for downloading, copying, storing, or using their copyrighted works and voiceprints, for which Apple is now facing potential massive liability.

9. Defendants were well aware of all of these issues with Apple's downloading, copying, and storing, and using the copyright holders' copyrighted works and YouTube videos, and commercialized voiceprints without their permission or compensation.

10. Defendants were also well aware of the potential liability for Apple's unauthorized utilization of copyrighted works and YouTube videos based on multiple individual and class action lawsuits against other corporations for copyright infringements relating to AI platforms, including: (i) *Kadrey v. Meta Platforms, Inc.*, No. 3:23-cv-3417-VC (N.D. Cal. 2023); (ii) *Concord Music Group Inc. v. Anthropic PBC*, No. 5:24-cv-03811-EKL (N.D. Cal. 2024) ("*Concord I*"); (iii) *Bartz v. Anthropic PBC*, No. 4:24-cv-05417-AMO (N.D. Cal. 2024); (iv) *In re Mosaic LLM Litigation*, No. 3:24-cv-01451-CRB (N.D. Cal. 2024); (v) *James v. Snowflake Inc.*, No. 2:25-cv-00108-BMM (D. Mont. 2025); (vi) *Nazemian v. Nvidia Corp.*, No. 4:24-cv-01454-JST (N.D. Cal. 2025); (vii) *Tanzer v. Salesforce Inc.*, No. 3:25-cv-08862-CRB (N.D. Cal. 2025); (viii) *Bird v. Microsoft Corp.*, No. 1:25-cv-05282 (S.D.N.Y. 2025); (ix) *Ted Entertainment, Inc. v. Nvidia Corp.*, No. 5:25-cv-10287-EJD (N.D. Cal. 2025); and (x) *Ted Entertainment, Inc. v. Amazon.com, Inc.*, 2:26-cv-01134 (W.D. Wash. 2026).

11. Defendants are also well aware of multiple, similar BIPA lawsuits filed against other AI platform development corporations, including: *Basich v. Microsoft Corp.*, No. 2:26-cv-00422 (W.D. Wash. 2026); *Amer v. Eleven Labs Inc.*, No. 1:26-cv-05437 (N.D. Ill. 2026); *Marin v. Alphabet, Inc.*, No. 1:26-cv-05436 (N.D. Ill. 2026); *Marin v. Meta Platforms, Inc.*, No. 1:26-cv-05438 (N.D. Ill. 2026);

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

*Delgado v. Meta Platforms, Inc.*, No. 3:23-cv-04181-SI (N.D. Cal. 2023); *Rogers v. NVIDIA Corp.*, No. 1:26-cv-05478 (N.D. Ill. 2026); *Dorcus v. Adobe Inc.*, No. 1:26-cv-05575 (N.D. Ill. 2026), and *Flowers v. Microsoft Corp.*, No. 1:26-cv-05491 (N.D. Ill. 2026).

12.     Indeed, another AI development company, Anthropic, paid damages of $1.5 billion to resolve the *Concord I* action, and is now subject to additional damages of up to $3 billion in a second action filed in 2026, *Concord Music Group Inc. v. Anthropic PBC*, No. 5:26-cv-00880-EKL (N.D. Cal. 2026) ("*Concord II*").  This tidal wave of litigation filed against AI developers like Apple served as blazing red flags alerting Defendants of the need to prevent Apple from committing and continuing to commit the same unlawful conduct.

13.     Copyright holders have filed two class actions against Apple for copyright infringement. On September 5, 2025, copyrighted book authors filed their class action lawsuit against Apple, *Hendrix v. Apple, Inc.*, No. 4:25-cv-07558-YGR (N.D. Cal.).  On April 3, 2026, intellectual property video creators filed their class action lawsuit against Apple, *Ted Entertainment, Inc. v. Apple, Inc.*, No. 3:26-cv-02936-RS (N.D. Cal.).  Beginning in 2019, Apple was sued by commercial voice persons and biometric identifiers for BIPA violations in class action lawsuits: *Zaluda v. Apple Inc.*, No. 2019CH11771 (Cir. Ct. Cook Cnty., Ill 2019); *Lopez v. Apple Inc.*, No. 4:19-cv-04577-JSW (N.D. Cal. 2019); *Hazlitt v. Apple Inc.*, No. 3:20-cv-00421-NJR (S.D. Ill. 2020); *Lacour v. Apple Inc.*, No. 1:26-cv-05536 (N.D. Ill. 2026). Apple agreed to settle the *Lopez* action in January 2025 for $95 million.  Thus, Defendants were, and are, well aware of the fraudulent and bad faith misconduct that has resulted in the copyright infringement class action filings, and the potential damages Apple may have to pay.

14.     As a result of all of this misconduct and violations, Apple's Chief Executive Officer ("CEO"), Tim Cook ("Cook"), unexpectedly stated on April 22, 2026, less than three weeks after the filing of the *Ted Entertainment* action, that he would step down from his CEO position on September 1, 2026.

15.     Apple is now saddled with having to defend itself in copyright infringement and BIPA

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

violation cases as a result of Defendants' misconduct and is facing potentially massive liability and related costs and reputational damages, as well as potential loss of customers and/or claims from Apple customers who unwittingly used the copyright and BIPA infringing Apple services.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because of claims arising under 15 U.S.C. § 78n(a), and SEC regulations 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 as to the state law claims alleged, as they arise out of the same transactions and occurrences as the federal claims.

17.    This Court retains general jurisdiction over each named defendant who is a resident in this District.  Additionally, this Court has specific jurisdiction over each named nonresident Defendant because each of the Defendants maintains sufficient minimum contacts in this District to render jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.  At the time of the alleged wrongdoing detailed herein, Apple was headquartered in this District, each of the Defendants was a director and/or officer of Apple, and Defendants' conduct was purposefully directed at this District. Exercising jurisdiction over any non-resident Defendant is also reasonable under the circumstances.

18.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 15 U.S.C. § 78aa.  Apple is headquartered in this District, one or more of the Defendants either resides in or works in this District, a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein in violation of fiduciary duties owed to Apple occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## DIVISIONAL ASSIGNMENT

19.    In compliance with Local Rule 3-5(b), Plaintiff requests that this action be assigned to the San Jose Division of this District because a substantial part of the events or conduct giving rise to the

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

claims in this action occurred in the County of Santa Clara.

## THE PARTIES

20.     Plaintiff Phil Rosen is a current stockholder of Apple and has continuously owned shares of Apple common stock at all times relevant herein.[1]

21.     Nominal defendant Apple is a California corporation headquartered in Cupertino.  Apple common stock trades on the Nasdaq under the ticker symbol "AAPL."

22.     Defendant Tim Cook ("Cook") is on Apple's board of directors (the "Board"), and Apple's current CEO until September 1, 2026.  Cook has been Apple's CEO since 2011.  Cook received roughly $74.3 million in compensation for 2025, $74.6 million in compensation for 2024, and $63.2 million in compensation for 2023, all approved by his co-defendants on the Board.  Cook announced on April 20, 2026, that he is stepping down from his role as CEO.

23.     Defendant Art Levinson ("Levinson") is the Chairman of the Board and has been a director since 2000.  Levinson is the CEO at Calico.  Levinson received over $557,231 in Board-related compensation for 2025.

24.     Defendant Wanda Austin ("Austin") has been a director since 2004 and is a member of the Audit Committee.  Austin is the retired President and CEO of The Aerospace Corporation.  Austin received over $412,850 in Board-related compensation for 2025.

25.     Defendant Alex Gorsky ("Gorsky") has been a director since 2021.  Gorsky is the retired CEO and Executive Chairman of Johnson & Johnson.  Gorsky received $412,982 in Board-related compensation for 2025.

26.     Defendant Andrea Jung ("Jung") has been a director since 2008.  Jung is the President and CEO and a member of the Board of Grameen America LLC.  Jung received $458,020 in Board-related

---

[1] The relevant time period is January 2023 to the present.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

compensation for 2025.

27. Defendant Monica Lozano ("Lozano") has been a director since 2021 and is a member of the Audit Committee. Lozano is the retired President and CEO of the College Futures Foundation. Lozano received $412,956 in Board-related compensation for 2025.

28. Defendant Ron Sugar ("Sugar") has been a director since 2010 and is a member of the Audit Committee. Sugar is the retired Chairman and Chief Executive Officer of Northrop Grumman Corporation. Sugar received $471,283 in Board-related compensation for 2025.

29. Defendant Sue Wagner ("Wagner") has been a director since 2014 and is a member of the Audit Committee. Wagner is a co-founder of BlackRock, Inc., and BlackRock's Vice Chair from January 2006 until her retirement in July 2012. Wagner also served as a member of BlackRock's Global Executive Committee and Global Operating Committee. Wagner received $445,373 in Board-related compensation for 2025.

30. Defendant Kevan Parekh ("Parekh") is Apple's Senior Vice President, Chief Financial Officer ("CFO"). Parekh oversees Apple's accounting, business support, financial planning and analysis, treasury, investor relations, internal audit, and tax functions. Parekh received roughly $22.5 million in 2025 compensation, approved by the Board.

31. Defendant Luca Maestri ("Maestri") is Apple's former Senior Vice President, CFO. Maestri's role was to oversee Apple's accounting, business support, financial planning and analysis, treasury, real estate, investor relations, internal audit, and tax functions. Maestri received $15.5 million in 2025 compensation, $27.2 million in 2024 compensation, and $27 million in 2023 compensation, all approved by the Board.

32. Defendant Kate Adams ("Adams") is Apple's Senior Vice President, General Counsel, and Secretary. Adams oversees all of Apple's legal matters, including corporate governance, intellectual property, litigation, compliance, global security, and privacy. Adams received approximately $27 million

- 7 -

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

in 2025 compensation, $27.2 million in 2024 compensation, and $27 million in 2023 compensation, all approved by the Board.

33.    Defendant Sabih Khan ("Khan") is Apple's Senior Vice President, Chief Operating Officer ("COO").  Khan oversees Apple's entire worldwide operations, environmental and social initiatives, as well as AppleCare customer service and support.  Khan leads the team in charge of Apple's global supply chain, ensuring product quality, and overseeing planning, procurement, manufacturing, logistics, and product fulfillment functions, as well as Apple's supply chain innovation programs that protect and educate workers at supplier facilities around the world.  Khan also oversees teams focused on Apple's environmental and social initiatives, accessibility and artificial intelligence data operations. As the leader of AppleCare, Khan also leads the dedicated teams that help customers navigate any service and support they need for all their Apple products and services.  Khan received $27 million in 2025 compensation, approved by the Board.

34.    Defendant Jeff Williams ("Williams") is Apple's former COO.  Williams' role was to oversee Apple's entire worldwide operations, as well as customer service and support.  He led Apple's renowned design team and the software and hardware engineering for Apple Watch, and he drove the Company's health initiatives.

35.    Defendant Deirdre O'Brien ("O'Brien") is Apple's Senior Vice President, Retail + People.  O'Brien oversees Apple's retail stores and online teams, and Apple's People team.  O'Brien received $27 million in 2025 compensation, $27.2 million in 2024 compensation, and $27 million in 2023 compensation, all approved by the Board.

36.    Defendants Cook, Levinson, Austin, Gorsky, Jung, Lozano, Sugar, and Wagner are collectively referred to herein as the "Director Defendants."  Defendants Sugar, Austin, Lozano, and Wagner, are collectively referred to herein as the "Audit Committee Defendants."  Defendants Cook, Adams, Khan, O'Brien, Parekh, Maestri, and Williams, are collectively referred to herein as the "Officer

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Defendants." The Director Defendants and the Officer Defendants are collectively referred to herein as the "Defendants."

## DUTIES OF THE DEFENDANTS

### A.    General Fiduciary Duties of Officers and Directors

37.    By reason of their positions as officers and directors of the Company, each of the Defendants owed Apple and its stockholders fiduciary obligations of care and loyalty, and were and are required to use their utmost ability to control and manage Apple in a fair, just, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of Apple and not in furtherance of their personal interest or benefit, and to exercise reasonable and prudent supervision (in like position) over the management, policies, practices, and controls of the financial affairs of the Company.

38.    The California Corporations Code requires each Defendant Director "shall perform the duties of a director, including the duties as a member of any committee of the board upon which a director may serve, in good faith, in a manner such director believes to be in the best interests of the corporation and its shareholders and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would under similar circumstances." CAL. CORP. CODE §309.

39.    Each Defendant Director "shall be entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, in each case prepared or presented by …. (1) One or more officers or employees of the corporation whom the director believes to be reliable and competent in the matters presented[;] (2) Counsel, independent accountants or other persons as to matters which the director believes to be within such person's professional or expert competence[;] (3) A committee of the board upon which the director does not serve, as to matters within its designated authority, which committee the director believes to merit confidence, so long as, in any such case, the director acts in good faith, after reasonable inquiry when the need therefor is indicated by the

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

circumstances and without knowledge that would cause such reliance to be unwarranted." CAL. CORP. CODE §309.

40.     Although a Defendant Director can be exculpated from liability for money damages for some breaches of fiduciary duty, "such a provision may not eliminate or limit the liability of directors (i) for acts or omissions that involve intentional misconduct or a knowing and culpable violation of law, (ii) for acts or omissions that a director believes to be contrary to the best interests of the corporation or its shareholders or that involve the absence of good faith on the part of the director, (iii) for any transaction from which a director derived an improper personal benefit, (iv) for acts or omissions that show a reckless disregard for the director's duty to the corporation or its shareholders in circumstances in which the director was aware, or should have been aware, in the ordinary course of performing a director's duties, of a risk of serious injury to the corporation or its shareholders, (v) for acts or omissions that constitute an unexcused pattern of inattention that amounts to an abdication of the director's duty to the corporation or its shareholders … no such provision shall eliminate or limit the liability of a director for any act or omission occurring prior to the date when the provision becomes effective." CAL. CORP. CODE §204(10).

41.     The California Corporations Code also requires that "each corporation shall have (1) a chairperson of the board, who may be given the title of chair of the board, chairperson of the board, chairperson, or a president or both, (2) a secretary, (3) a chief financial officer, and (4) such other officers with such titles and duties as shall be stated in the bylaws or determined by the board and as may be necessary to enable it to sign instruments and share certificates." CAL. CORP. CODE §312(a).

42.     The Officer Defendants do not benefit from any exculpation clause: "no such provision shall eliminate or limit the liability of an officer for any act or omission as an officer, notwithstanding that the officer is also a director or that his or her actions, if negligent or improper, have been ratified by the directors." CAL. CORP. CODE §204(10).

43.     Apple's Articles of Incorporation state that the "purpose of this corporation is to engage in

- 10 -

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

any lawful act or activity," which commits the Defendants to conduct compliant activities, and reminds them that profitable but unlawful activities would violate the purpose of the corporation.

44. Apple's Corporate Governance Guidelines state that:

(a) The Board oversees the CEO and other senior management in the competent and ethical operation of the Corporation on a day-to-day basis and seeks to ensure that the long-term interests of shareholders are being served. To satisfy its duties, directors are expected to take a proactive, focused approach to their position to ensure that the Corporation is committed to business success through the maintenance of high standards of responsibility and ethics.

(b) The Board expects its directors, as well as officers and employees, to act ethically. Directors are expected to adhere to the Corporation's Business Conduct Policy and the Guidelines Regarding Director Conflicts of Interest.

(c) The fundamental role of the directors is to exercise their business judgment to act in what they reasonably believe to be the best interests of the Corporation and its shareholders. In fulfilling that responsibility, directors reasonably may rely on the honesty and integrity of the Corporation's senior management and expert legal, accounting, financial and other advisors.

45. Defendants, because of their positions of control and authority as directors and/or officers of Apple, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

46. Defendants' conduct complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Apple, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its stockholders that Defendants were aware or should have been aware posed a risk of serious injury to the Company.

47. As senior officers and directors of a publicly-traded company whose common stock was

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

registered with the SEC pursuant to the Securities Exchange Act (the "Exchange Act") and traded on the Nasdaq, the Defendants also had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, operations, products, management, and internal controls, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

48. Because of their advisory, executive, managerial, and directorial positions with Apple, each of the Defendants had access to adverse, non-public information about the Company.

49. Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Apple.

### B.   Apple's Code of Business Conduct

50. In addition to the fiduciary obligations owed to Apple, each of the Defendants were also subject to layers of Apple policies prohibiting certain conduct.

51. All Officer Defendants are subject to all facets of the Company's Code of Business Conduct, and all Director Defendants are subject to the relevant sections of the Company's Code of Business Conduct as set forth below, which purports to establish the principles of business conduct that Apple considers fundamental in its operations worldwide. In particular, the Code of Business Conduct provides that each officer, director and employee must:

    (a) Comply with the letter and spirit of Apple's Business Conduct Policy and all applicable legal requirements. Any failure to exhibit ethical or appropriate workplace behavior or to comply with Apple's Business Conduct Policy—or

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

failure to report a policy, regulatory, or legal violation—may result in disciplinary action, up to and including termination of employment.

(b)     If you see or hear of any violation of Apple's Business Conduct Policy, other Apple policies, or legal or regulatory requirements, you must notify either your manager, People Team, Legal, or Business Conduct.

(c)     Apply Apple's principles of business conduct, and review our policies and legal requirements. When in doubt about how to proceed, discuss it with your manager, your People Business Partner, Legal, or Business Conduct.

52.     In order to comply with duties and obligations for "Protecting Apple":

(a)     Specific to Apple's AI, Apple is committed to the safe and responsible use of artificial intelligence (AI). This includes safeguarding confidential information and intellectual property, protecting user data, respecting our vendor requirements, and complying with regulatory requirements. The Apple AI Policy serves as the foundational guidance for all AI development and use, and outlines the requirements for using AI across Apple, whether you're using internal tools, developing products and services, or writing code. The AI Individual Use Policy specifies the requirements for the acceptable use of AI tools, platforms, and systems for personal productivity purposes to facilitate Apple work ("individual use"), and some organizations have additional policies for AI use specific to organization functions.

(b)     For Third-Party Intellectual Property, Apple respects third-party intellectual property. Never use the intellectual property of any third party without permission or legal right. If you are told or suspect that Apple may be infringing on third-party intellectual property, including patents, copyrights, trademarks, or trade secrets, contact Legal.

(c)     For Copyright-Protected Content, never use or copy software, music, videos, publications, or other copyright-protected content at work or for business purposes

- 13 -

unless you or Apple are legally permitted to use or make copies of the protected content. You should never use Apple facilities or equipment to make or store unauthorized copies. For more information about personal content on Apple-owned devices, see the Employee Use of Electronic Systems and Communications Policy.

(d)    For Activities Related to Open Source Software, open source software is usually collectively developed software with its source code made available under an open source license. Before using, modifying, or distributing any open source software for Apple infrastructure, or as part of an Apple product or service development effort, you must receive management and Legal approval. For additional information on how to submit requests, visit Open Source at Apple. This website also includes information about personal contributions to Open Source and required approvals.

53.    In order to comply with duties and obligations for "Business Integrity":

(a)    For Obtaining and Using Business Intelligence, gathering information about customers, competitors, and markets in which we operate is a common business practice, but you must always do so with integrity. You may generally obtain information from public sources, surveys, and competitive research. Personal information shall not be obtained from third parties without confirming with Privacy. We do not seek business intelligence by illegal or unethical means. It is never appropriate to engage in theft, espionage, or breach of a non-disclosure agreement. If you obtain confidential nonpublic information, accidentally or provided by unknown sources, that relates to a competitor, it may be unethical to use the information. If this happens to you, immediately contact your manager, Legal, or Business Conduct.

**C.    Apple's Audit and Finance Committee Charter**

54.    The Audit Committee Defendants are subject to heightened responsibilities to identify,

- 14 -
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

assess, and mitigate risks associated with the Company's operations.

55.     According to the 2025 Proxy:

(a)     The Audit Committee oversees financial matters, business conduct, and legal and regulatory compliance, including antitrust matters, public policy expenditures, privacy, cybersecurity, and tax matters, and has primary responsibility for assisting the Board with risk oversight.

(b)     The Audit Committee regularly reviews and discusses with management Apple's compliance and business conduct risks. Apple's Chief Compliance Officer is responsible for the development, review, and execution of Apple's Compliance and Business Conduct program and regularly reports to the Audit Committee.

(c)     The Audit Committee regularly reviews and discusses with management Apple's privacy and data security risks. The Audit Committee receives regular updates from management, including Apple's Head of Corporate Information Security. Additionally, the Audit Committee reviews reports on privacy and data security matters from Apple's General Counsel, Chief Compliance Officer, and the heads of Business Assurance and Internal Audit.

(d)     The Audit Committee oversees legal and regulatory risks related to Apple's business. Apple's full Board also receives regular updates on legal and regulatory developments, including updates on legislative developments, government investigations, litigation, and other legal proceedings.

56.     Under the Audit and Finance Committee Charter, the purpose of the Audit and Committee Defendants is to assist the Board in oversight and monitoring of:

(a)     the Corporation's financial statements and other financial information provided by the Corporation to its shareholders and others;

(b)     compliance with legal, regulatory and public disclosure requirements;

(c)     the independent auditors, including their qualifications and independence;

- 15 -

(d)    the Corporation's systems of internal controls, including the Internal Audit function;

(e)    treasury and finance matters;

(f)    enterprise risk management, privacy and data security; and

(g)    the auditing, accounting, and financial reporting process generally.

57.    For Financial Reporting, the Audit Committee is required to:

(a)    Review with management and the independent auditor:

(i)    the Corporation's annual audited financial statements, and related footnotes, and quarterly unaudited financial statements, including the disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to filing the Corporation's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, respectively, with the SEC;

(ii)    the independent auditors' audit of the annual financial statements and their report thereon;

(iii)    the accompanying management letter and any reports with respect to interim periods;

(iv)    any material changes to the Corporation's accounting principles and practices used in preparing financial statements to be filed with the SEC;

(v)    any significant changes required in the independent auditors' audit plan, and other matters related to the conduct of the audit that are to be communicated to the Committee under the auditing standards of the Public Company Accounting Oversight Board.

(b)    Review with management, the independent auditors, and the Corporation's counsel, as appropriate, any legal and regulatory matters that may have a material impact on the financial statements, related compliance policies, and programs and reports received from regulators.

- 16 -

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

(c)    Review and discuss earnings press releases, including the use of non-GAAP financial measures, prior to public disclosure.

(d)    Provide a report for inclusion in the Corporation's proxy statement in accordance with the rules and regulations of the SEC.

(e)    Oversee compliance with the requirements of the SEC for disclosure of auditors' services and audit committee member qualifications and activities.

(f)    Discuss with the independent auditors the financial statements and audit findings, including any significant adjustments, management judgments and accounting estimates, significant new accounting policies and any other matters required to be discussed by the applicable requirements of the Public Company Accounting Oversight Board and the SEC, as in effect at the time in the case of annual statements, and Auditing Standard 4105, as in effect at the time in the case of quarterly statements.

58.    For Risk Oversight, Privacy and Data Security, the Audit Committee is required to:

(a)    Review and discuss with management:

(i)    management's program to identify, assess, manage, and monitor significant business risks of the Corporation, including financial, operational, privacy, data security, business continuity, tax, legal and regulatory compliance, and reputational risks; and

(ii)    management's risk management decisions, practices, and activities.

(b)    Review and discuss with management the Corporation's privacy and data security risk exposures, including:

(i)    the potential impact of those exposures on the Corporation's business, financial results, operations and reputation;

(ii)    the steps management has taken to monitor and mitigate such exposures;

(iii)    the Corporation's information governance policies and programs; and

    (iv) major legislative and regulatory developments that could materially impact the Corporation's privacy and data security risk exposure.

  (c) Regularly report to the Board the substance of such reviews and discussions and, as necessary, recommend to the Board such actions as the Committee deems appropriate.

## D. Breaches of Duties

59. Defendants' conduct constitutes a knowing and culpable breach of their duties as officers and/or directors of Apple, demonstrating a lack of good faith and a reckless disregard for their obligations to the Company, as their actions violated privacy law and they either knew or were reckless in failing to recognize that their actions posed a significant risk of serious harm to the Company.

60. Defendants breached their duty of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to violate copyright laws, federal securities laws, and to cause, or by themselves causing, the Company to make improper statements to the public and failing to implement adequate internal controls over legal and regulatory compliance. These improper practices caused Apple to incur substantial damages.

61. Defendants, because of their positions of control and authority as officers or directors of Apple, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. Defendants also failed to prevent the other Defendants from taking such illegal actions. As a result, and in addition to the damage the Company has already incurred, Apple has expended, and will continue to expend, significant sums of money to remedy Defendants' failures.

## FACTUAL BACKGROUND

### A. The Apple Intelligence Process

62. In June 2024, Apple announced the development of its AI platform, Apple Intelligence. Apple Intelligence includes multiple generative-AI models and related tools and technologies. To train

these generative-AI models, Apple amassed an enormous library of data that includes copyrighted works, copied without author consent, credit, or compensation.

63.    Apple Intelligence includes Apple's LLMs, OpenELM language models and Foundation Language Models.  LLMs are trained by copying an extensive amount of textual works, and then feeding those copies into the model platform.  This "corpus of text" is called the "training dataset."

64.    During training, the LLM copies and ingests each textual work from the training dataset, and extracts protected expression from it into stored weights.  The LLMs then can emit convincing stimulations of natural written language into user prompts, which is performing a computation that relies on these stored weights and imitating the protected expression ingested from the training dataset.

65.    Much of this material in Apple's training dataset does consist of copyrighted works that Apple copied without consent and without providing credit or compensation.

**B.    Apple's OpenELM Language Models**

66.    Apple released its OpenELM language models in April 2024, which included OpenELM-270M, OpenELM-450M, OpenELM-1_1B, and OpenELM-3B.  Each OpenELM model is hosted on the Hugging Face website.

67.    On Hugging Face, OpenELM models are described in "model cards" that describe the model, its intended uses and limitations, training parameters, and the training dataset used to train the model.  The "model card" for each OpenELM model states that "Our pre-training dataset contains … a subset of RedPajama."  Further, Apple has published the "OpenELM Paper" that reveals a large quantity of Apple's training data comes from the "Books3" subset of the RedPajama dataset.

68.    The RedPajama dataset is hosted on Hugging Face, and "is a publicly available, fully open, best-effort reproduction of the training data … used to train the first iteration of LLaMA family of models."  This LLaMA training dataset included the Books3 section of "The Pile" (a broader, publicly available dataset which contained Books3).

- 19 -
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

69. In October 2020, the Books3 dataset, consisting of approximately 196,640 books sourced from the online pirate "shadow library" Bibliotek, was made available online to provide AI developers with access to high-quality data. The Books3 dataset included copyrighted books without permission, in violation of the Copyright Act.

70. The Pile that includes Books3 is a dataset articulated in a paper by EluetherAI called "The Pile: An 800GB Dataset of Diverse Text for Language Modeling," which described the Books3 as "a dataset of books derived from a copy of the contents of the Bibliotik private tracker … Bibliotik consists of a mix of fiction and nonfiction books and is almost an order of magnitude larger than our next largest book dataset (BookCorpus2). We included Bibliotik because books are invaluable for long-range context modeling research and coherent storytelling."

71. Bibliotik is well known as a notorious pirate website that contains vast quantities of unauthorized copyright materials used to train AI language models. Utilizing these illegal libraries provided Apple and other AI entities to access large quantities of training data rapidly. Such pirate libraries are in violation of the Copyright Act, and the AI developers' use of such materials to train AI models is not shielded by the fair use doctrine.

72. The Books3 dataset, as confirmed by the person that assembled it, Shawn Presser, represents all of Bibliotik. And, downloading the Pile dataset from sources such as "The Eye" and the "Hugging Face" downloads a copy of Books3 and all of its unlicensed copyrighted material.

73. In October 2023, the Books3 dataset was removed based on the fact that it "is defunct and no longer accessible due to reported copyright infringement." The Books3 dataset removal was messaged in RedPajama dataset documentation due to reported copyright infringement. Prior to October 2023, any person or entity that downloaded the RedPajama or The Pile datasets from Hugging Face was therefore downloading a copy of the Books3 dataset.

74. On March 20, 2025, the Danish Rights Alliance issued a report that articulated "'Classic

- 20 -

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

pirate sources' are widely used to train AI datasets."[2]  "Generative AI model providers across the spectrum of LLMs, image, video and music generation (platforms) have obtained infringing copies of copyright protected works that were sourced from 'classic pirate sources' such as illegal filesharing and streaming sites."[3]  The report also describes how Apple, and other generative AI developers, obtain piracy datasets from Books3 and Common Crawl.  Specifically, Apple's OpenELM has used multiple publicly available compiled datasets "that contain infringing copies of copyright protected works from illegal sources."[4]

75.     The Danish Rights Alliance Report also articulated that Books3, Common Crawl, Opensubtitles, and RedPajama datasets with copyright infringement were in the Pile.[5]  This Report states that Apple's OpenELM model used Books3, Opensubtitles, and Common Crawl, and "Apple provides access to a range of LLMs called OpenELM.9, which was pretrained using The Pile and RedPajama."

76.     Based on the OpenELM Paper, Apple disclosed its utilization of the RedPajama dataset, which included the Books3 subset.  The Danish Rights Alliance Report stated that OpenELM also used Opensubtitles and Common Crawl.  Thus, Apple trained its OpenELM models on a copy of Books3, a known body of pirated books, which directly infringed copyright holders whose books were on the RedPajama dataset, and Opensubtitles and Common Crawl which incorporated copyright infringement.

**C.    Apple's FLMs**

77.     Apple described its FLMs in a paper released by Apple on July 29, 2024, the "FLM Paper." The FLM Paper described Apple's FLMs as "highly capable in tasks like language understanding, instruction following, reasoning, writing, and tool use … These foundation models are at the heart of

---

[2]    Available    at:    https://piracymonitor.org/report-classic-pirate-sources-are-widely-used-to-train-ai-datasets-says-danish-rights-alliance/.

[3] *Id.*

[4] *Id.*

[5] *Id.*

Apple Intelligence."

78.     The FLM Paper identified two FLMs, AFM-sever and AFM-on-device.  The AFM-server model is a large model for use in the cloud service operated by Apple, the Private Cloud Compute.  The AFM-on-device model is a small model for use directly on Apple devices, including iPhones, iPads, and laptops.  Both models are trained on the same corpus of training data.  The FLM Paper referenced three sources of training data, "licensed from publishers, curated publicly available or open-sourced datasets, and publicly available information crawled by our web-crawler, Applebot."

79.     Apple's source of training data it licensed was "a limited amount of high-quality data from publishers," but was **not** used during the main phase of training the FLMs.

80.     By contrast, Apple's "publicly available or open-sourced datasets" were instead works downloaded from the public internet, which contains a vast number of copyrighted works by authors who have not granted a license for reproduction, resulting in copyright infringement.  Books3 has been described by people in the AI industry as a "publicly available" or "open-sourced" datatset.  Based on Apple's disclosure that Apple already had a copy of Books3 that it had used for training its OpenELM models, it is therefore likely that Apple's reference to FLMs' "publicly-available or open-sourced datasets" includes Books3, and Apple included Books3 in the training dataset for its FLMs.

81.     Apple's third source of FLM training data, web pages crawled by Applebot, also "crawl[s] publicly available information using [Apple's] web crawler Applebot."  Applebot has been crawling the web since approximately mid-2015.  As of June 2024, Apple revealed that it was using Applebot-scraped data for training its AI models.  As of August 2024, in response to this disclosure, multiple web publishers chose to opt out of Applebot training.

82.     Apple states in the FLM Paper that "We evaluated and selected a number of high-quality publicly-available datasets with licenses that permit use for training language models. Then, we filtered the datasets to remove personally identifiable information before including them in the pre-training

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

mixture." "We use a hybrid data strategy in our post-training pipeline, which consists of both human annotated and synthetic data." "To fuel the instruction fine-tuning of AFM, we collect high-quality human annotated demonstration datasets from various sources." "We then collect human annotations to improve model capabilities that involve multi-tool and multi-step scenarios." We carefully select and combine both human data and synthetic data to form a high quality mixture that covers various natural language use cases."

83. Also in the FLM Paper, Apple says that Applebot pages are "processed by a pipeline which performs quality filtering … using heuristics and model-based classifiers." In this context, the term "model-based classifier" refers to a separate AI model that has been trained to algorithmically rate the quality of scraped web pages. Based on this assessment, these model-based classifiers are themselves trained on datasets that include unlicensed copyrighted works.

84. In further support of this assessment, a November 2024 paper by George Wukoson and Joey Fortuna entitled *The Predominant Use of High-Authority Commercial Web Publisher Content to Train Leading LLMs*, included a study of LLM training datasets made by algorithmically filtering scraped web pages. The authors concluded that such "datasets are disproportionately composed of high-quality content owned by commercial publishers of news and media websites." This material is generally covered by registered copyright holders, causing LLM companies to "cease[] publishing training details, and publishers have brought litigation against them."

85. The shadow libraries that host millions of unlicensed copyrighted books are also part of the "publicly available information" reachable by a web scraper like Applebot. Thus, the part of Apple's training dataset that comes from filtered Applebot pages includes copyrighted works from commercial news and media websites, and part of Apple's training-data library is sourced from shadow libraries via Applebot.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**D.     Apple AI Video**

86.     Apple AI Video is not a research tool.  Apple requires significant amounts of data to feed, train, improve, and commercialize Apple AI Video into a text-to-video generative AI model.  Apple has sought to develop AI Video to turn language prompts into audiovisual content, and to create an AI product that accepts language instruction and produces a video based on that instruction.

87.     Apple's central dataset for Apple AI Video is Panda-70M, a derivative dataset of HD-VILA-100M, compiled by Snap, Inc.  Apple trained its AI Video on Panda-70M, a dataset derived from millions of YouTube videos that were extracted from YouTube through circumvention of YouTube's TPMs.  Apple researchers publicly disclosed its Apple AI Video training on Panda-70M in a paper entitled *STIV: Scalable Text and Image Conditioned Video Generation*.  The paper stated:

> We build a video data engine pipeline that includes video pre-processing, captioning, and filtering to accelerate the model's development when handling large-scale videos is required. Specifically, we apply PySceneDetect to analyze video frames, detect and segment scenes based on abrupt transitions and gradual fades. This segmentation is followed by the feature extractions for filtering, including motion score, aesthetic score, text area, frame dimensions, clarity score, temporal consistency, and video orientation, among others. For each video segment, we perform dense captioning and categorization to gain a comprehensive understanding of video distribution. To further enhance caption quality, we adapt DSG and propose DSG-Video, a metric designed to assess hallucination rates and overall caption quality. This data engine is integral in filtering videos and preparing tailored datasets for different training stages: our data sources include **Panda-70M** and an internally curated high-quality dataset of 42M videos. Using our data engine, we curate over 90M high-quality video-caption pairs.
>
> *****
>
> Data quality is pivotal for video generation models. However, curating large-scale, high-quality datasets remains challenging due to issues like noisy captions, hallucinations, and limited diversity in video content and duration …. Our approach focuses on three key questions: (1) How to preprocess raw videos for better consistency? (2) What is the effect of data filtering on model performance? (3) How can advanced video captioning reduce hallucinations and improve outcomes? We use Panda-70M as a working example and produce a curated subset, Panda-30M, via our pipeline.

- 24 -

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

*****

> We develop an automated filtering infrastructure that supports efficient data selection, quality control, and continuous improvement throughout the model's development lifecycle. For instance, we can sample high-quality videos with predefined resolutions / motion scores for the fine-tuning stage. This filtering system allows us to systematically remove low-quality videos and focus on data that enhances model performance. From Panda-30M, we further apply filtering based on motion score and aesthetic score to obtain Panda-10M, named as a high-quality version of Panda-30M.

*****

> High-quality video-text pairs are essential for training text-to-video models. Existing datasets often suffer from noisy or irrelevant captions, limited in describing temporal dynamics. We initially attempted a frame-based captioning approach followed by LLM summarization, but found that single-frame captions fail to represent motion, and LLM summarization can induce hallucinations.

*****

> Specifically, we do finetuning on top of the pretrained video generation models (SFT), based on the 20,000 videos filtered from Panda-70M.

88.    The Panda 70M dataset functions as a map or index file identifying specific YouTube videos and clips by URL, video identifier, and time stamp.  The Panda 70M is a dataset compiled from 3,098,462 YouTube videos and consists of 70.8 million video clips extracted from those YouTube videos, none of which were obtained with the authorization of YouTube or the copyright holders of the YouTube videos.  Panda 70M disclosed its dataset process in a paper entitled *Panda-70M: Captioning 70M Videos with Multiple Cross-Modality Teachers*:

> We dub the dataset as Panda-70M. We show the value of the proposed dataset on three downstream tasks: video captioning, video and text retrieval, and text-driven video generation. The models trained on the proposed data score substantially better on the majority of metrics across all the tasks.

*****

> In this work, we present a large-scale dataset containing 70M video clips with caption annotations. It includes high-resolution videos from an open domain with rich captions averaging 13.2 words per caption. While manually annotating 70M videos is prohibitively expensive, we opt for

- 25 -

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

automatic annotation. Our key insight is that a video typically comes with information from several modalities that can assist automatic captioning. This includes the title, description, subtitles of the video, individual static frames, and the video itself.

*****

To establish the dataset with this mindset, we begin by using 3.8M high-resolution long videos collected from HD-VILA-100M and process them through the following three steps. First, we design a semantics-aware video splitting algorithm to cut long videos into semantically consistent clips while striking the balance between semantics coherence and the duration of the video clips. Second, we use a range of cross-modality teacher models, including image captioning models and image/video visual-question-answering (VQA) models with additional text inputs, such as video description and subtitles, to predict several candidate captions for a clip. Lastly, we collect a 100K video subset, where human annotators act as an oracle to select the best caption for each video. We use this dataset to finetune a fine-grained video-to-text retrieval model which is then applied to the whole dataset to select the most precise caption as the annotation.

*****

We utilize several vision-language models for the annotation of Panda-70M. BLIP-2 introduces an efficient vision language pretraining that can facilitate image captioning. We use BLIP-2 as one of the teachers and input a randomly sampled video frame for captioning.

*****

In addition to a video frame, we also input a prompt with extra text information, such as video description and subtitles, and ask the model to summarize all multimodal inputs. For the video modality, Video-LLaMA and VideoChat are both video VQA models and learn to extract LLM-compatible visual embeddings. We use both models and ask them to caption a video with prompt input.

*****

To build Panda-70M, we utilize 3.8M high-resolution long videos collected from HD-VILA-100M.

*****

We also implement additional procedures to handle: 1) long videos without any cut-scenes, 2) videos using complex transitions, such as fade-in and fade-out effects, which are not usually detected as cut-scenes, and 3) removal of redundant clips to increase the diversity of the dataset …. Notably, while our dataset focuses on fine-grained video-text pairs with consistent semantics, users can still acquire long videos with multiple cut-

- 26 -

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

scenes by concatenating consecutive clips and captions, as these clips are split from the same long video.

\*\*\*\*\*

To evaluate the performance of video captioning, we use Video-LLaMA with the vision branch only as the base model. We compare two pretraining weights: the official weight, which is jointly trained on 2.5M video-text pairs and 595K image-text pairs, and the weight trained on our Panda-2M from scratch. Panda-2M is a randomly sampled subset of Panda-70M and shares the same amount of training samples as the official weight. We also train our student model with both video and text branches on complete Panda-70M for better captioning performance. For all models, we use the same backbone, using Vicuna-7B [18] as the large-language model, ViT and Q-Former as the video encoder, and the linear projection layer from MiniGPT-4.

\*\*\*\*\*

We test zero-shot video captioning on two benchmarks: MSR-VTT and MSVD. MSR-VTT contains 10K videos with 20 manually annotated captions for each video; we report the results on the 2,990 testing split. MSVD consists of 1,970 videos with a total of 80K descriptions; we report the numbers on the 670 testing videos.

\*\*\*\*\*

The standard protocols jointly use 3M images from CC3M [64] and 2.5M videos as the pretraining datasets. Thus, we randomly sample a Panda-5M subset, which shares the same number of training samples as the standard pretraining dataset for a fair comparison. For both datasets, we use the same backbone composed of ViT-L/16 and BERTlarge. We use the official weights for the standard datasets pretraining and train the model from scratch for our Panda-5M.

89.    Apple's researchers confirmed in writing that Apple AI Video was trained on a dataset derived from YouTube content accessed through circumvention of YouTube's TPMs.  Content creators that upload content to YouTube authorize and instruct YouTube to provide protection through YouTube's anti-circumvention software, which is a driving factor to encourage content creators to upload their video content to YouTube.  Rather than seek permission or pay a fair price for the audiovisual content hosted on YouTube, Defendants caused Apple to harvest content creators' protected and copyrighted videos for commercial use and compilation into datasets without consent or compensation to the content creators.

90.    YouTube permits public voice of audiovisual works on its platform but does not authorize

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

access to audiovisual works through automated extraction, direct retrieval of media streams, or reconstruction of works outside its controlled environment. To prevent access to these video files, YouTube's TPMs are designed to control, restrict, and monitor access, and to deter extraction outside YouTube's controlled playback environment. YouTube's TPMs control how videos are delivered and accessed, providing videos only in small segment pieces, through temporary links placed only on YouTube's system. YouTube's TPMs then prevent users from obtaining the videos outside of YouTube's controlled delivery system.

91. To access this platform system, YouTube requires users to apply in the authorized process sequence, which includes "the issuance and validation of session-specific tokens, execution of player-side instructions, and reconstruction of segmented media streams into a continuous audiovisual experience." The audiovisual work cannot be accessed by public users without these technological processes.

92. YouTube's TPMs are "gatekeeping" mechanisms that include: "(1) an obfuscated signature system commonly referred to as a 'rolling cypher,' (2) IP-based blocking and rate limiting that restrict high-volume automated access, (3) short-lived, session-bound streaming URLs, (4) CAPTCHA human-verification challenge triggered by automated activity, and (5) proof-of-origin tokens that verify requests originating from authorized client environments."

93. Apple AI Video requires significant amounts of data to feed, train, improve, and commercialize. To do so, Defendants caused Apple to utilize automated systems and tools that effectively bypassed YouTube's TPMs to access and obtain audiovisual works, and reconstruct and assemble the protected media streams outside YouTube's authorized environment. Apple then reproduced these videos to assemble training corpora for Apple's AI models and services.

**E.      Apple's CVMs**

94. Apple set up its CVMs on Touch ID, Face ID, Personal Voice, App Tracking Transparency, Secure Enclave, and Private Cloud Compute. Apple built its CVMs by extracting voiceprints from the

- 28 -

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

recordings of real people, without their knowledge and consent. To build the technology that powers Apple's voice products, Apple took recordings of real human voices, fed them into a training pipeline to extract each speaker's voiceprint, and used those voiceprints to develop commercial products that contribute to Apple's approximately $416 billion in annual revenue and its more than $4 trillion market capitalization. The voices belonged to journalists, podcasters, audiobook narrators, voice actors, and other performers who were never informed that their vocal identities were being captured, never told why, and never given the chance to object.

95.     Apple's Touch ID, Face ID, and Personal Voice systems store user biometric data exclusively within the Secure Enclave, a dedicated hardware coprocessor isolated from the main application processor. Apple has publicly committed that this biometric data is never transmitted off the device, never made available to Apple itself, and never made available to applications. Apple's Personal Voice feature, released in September 2023, applies parallel protections to user voice biometric data: on-device recording and fine-tuning, encrypted storage, own-voice-only synthesis, and personal, noncommercial use restrictions. Apple is institutionally capable of building voice-cloning technology with rigorous consent and rights protections. It implemented those protections for its users. It did not implement them, or any equivalent, for the third parties whose voices it had already used to train the foundational voice models that Personal Voice and Apple's other voice products rely upon.

96.     Apple's CVMs include:

(a)     *Siri*, Apple's voice assistant, deployed across iPhone, iPad, Mac, Apple Watch, HomePod, AirPods, CarPlay, and Apple TV, with voice in more than thirty languages and speech recognition serving hundreds of millions of users;

(b)     *Personal Voice*, released in iOS 17 in September 2023, is an on-device feature that lets a user create a synthetic clone of his or her own voice from prompted

- 29 -

recordings, built on a pre-trained acoustic and vocoder base model that Apple publicly describes as trained on the LibriTTS corpus;

(c)    *Live Speech*, which generates spoken audio from typed text in real time during phone and FaceTime calls;

(d)    "*Narrated by Apple Books*," Apple Books' digital narration program, launched in January 2023, that distributes synthetic-narration audiobooks generated by voice models trained on human narrators, with synthetic voices including Madison and Jackson for fiction and romance and Helena and Mitchell for non-fiction and self-development;

(e)    *Dictation, Voice Memos transcription, Live Voicemail, and iMessage audio-message transcription*, speech-recognition features deployed across Apple's consumer products; and

(f)    *SFSpeechRecognizer and SpeechAnalyzer*, developer APIs that route Apple's speech models into third-party applications.

97.    CVMs work by training computational models on large quantities of recorded human speech.    These "speaker embeddings" include speaker voice characteristics such as timbre, pitch, resonance, cadence, articulation, phrasing, dynamics, and emotional expression.    Apple's CVMs extract these characteristics.    Apple's 2023 Personal Voice research publication describes "voice model pretraining and fine-tuning" explicitly: a base voice model is first trained on a corpus of speech and then specialized to mimic a target speaker, with the cleaned pre-training dataset comprising "300 hours of 1000 speakers" from the LibriTTS dataset.    The LibriTTS dataset is derived from LibriVox, where individual narrators read public-domain books and donate their recordings for audiobook listening, but not for use as commercial voice-cloning.    These LibriVox volunteer narrators did not consent to the extraction of their voiceprints or biometric information for commercial voice-cloning, were not informed by Apple that this occurred, and were not provided any payments from Apple for their voice-cloning.

98.    In January 2023, Apple launched a "*Narrated by Apple Books*" digital narration, marketed

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

as "digital voice[s] based on a human narrator." Within weeks, public reporting revealed that Apple had obtained training audio for its synthetic narration voices through Findaway Voices, a Spotify-owned audiobook distributor, under a contract clause that authorized Apple to "use audiobook files for machine learning training and models." Authors and audiobook narrators publicly stated that they had not been told of, and had not consented to, this use. Following intervention by SAG-AFTRA, Apple agreed in February 2023 to halt "use of files for machine learning purposes," with the halt covering "all files dating back to the beginning of this practice."

99. The voiceprints and biometric information extracted during training are not stored as discrete files separate from the resulting models. They are encoded directly into the parameters, the numerical weights, of the foundational voice synthesis models. At this technical layer, the biometric data and the trained model are the same thing. Deleting the underlying training recordings does not remove the voiceprints; they persist in the model weights and continue to inform every output the model generates. Apple's commercial use of the models—every Siri voice request, every Personal Voice synthesis, every "Narrated by Apple Books" audiobook generation, every SFSpeechRecognizer API call—is the ongoing use of the voiceprints encoded within them. The voiceprints and biometric information are encoded in the CVMs, transmitted across Apple's internal corporate and cloud infrastructure, and deployed in commercial products distributed globally on iPhone, iPad, Mac, Apple Watch, HomePod, AirPods, CarPlay, and Apple TV.

100. Apple has not publicly identified which audiobook files it ingested, how many narrators' voices contributed to its synthetic narration models, or whether the synthetic voices Apple now sells through Apple Books still contain biometric information derived from those files. It does not address the voiceprints and biometric information already extracted, already encoded in Apple's foundational models, and still being deployed in Apple's commercial products. Apple has never publicly identified that it possesses voiceprints or biometric information extracted from non-user training recordings. Apple has

- 31 -

never described the storage location, transmission protocols, encryption regime, access controls, or retention practices applicable to those voiceprints. Apple has never made publicly available a retention and destruction policy applicable to non-user voiceprints.

### F.    Red Flags of Apple's Copyright Infringement

101.    Defendants were well aware of the potential liability stemming from Apple's unauthorized use of copyrighted works in developing OpenELM, FLMs, Apple AI Video, and CVMs.

102.    First, all of the Officer Defendants were personally involved in the development of Apple's AI strategy and the details of the OpenELM and FLM datasets Apple chose as its LLMs to develop the Company's AI products instead of other commercially available LLMs that did not include copyrighted material, and the unauthorized access and extraction of videos from the YouTube platform to obtain the training data necessary to build and commercialize its Apple AI Video on Panda-70M.

103.    Second, the multiple individual and class action lawsuits against other AI developers for copyright and BIPA infringement put all Defendants on notice of the need to avoid using unlicensed copyrighted materials in the LLMs, VLMs and CVMs used to train Apple Intelligence AI models. Multiple class actions filed beginning in 2023 prior to the copyright infringement lawsuits filed against Apple involve claims against Apple's competitors based on the exact same approach to Defendants' construction of an AI training database premised on RedPajama, Books3, Pile, Common Crawl, and Panda-70M.

104.    The first action filed against Anthropic in 2023, *Concord I*, alleged that Anthropic "torrented 'countless pirated copies' of songbooks and sheet music."[6]  Anthropic "used BitTorrent to download publishers' works" and "simultaneously uploaded to the public large unauthorized copies of the same works, separately violating publishers' exclusive right of distribution and encouraging further

---

[6]  Hailey Konnath, *Anthropic Hit With 2nd Music IP Suit, This Time for $3B*, Law360 (Jan. 28, 2026); available at: https://www.law360.com/articles/2435463/.

infringement of their copyrighted works."[7]

105.    Copyright holders pursuing litigation against AI developers have focused in on the RedPajama and Common Crawl datasets and the copyright-infringing data in Books3.

106.    Copyright holders filed a lawsuit against NVIDIA in 2025, alleging that NVIDIA "copied … copyrighted works multiple times to train its language models, including from known pirated libraries [that] …. include The Pile, Bibliotek, and Anna's Archive." *Nazemian v. NVIDIA Corp.*, No. 4:24-cv-01454-JST (ECF No. 225 at 2).  NVIDIA conceded that Anna's Archive, Z-Library, LibGen, SciHub, and SlimPajama were connected to pirated libraries, and the Court denied NVIDIA's argument in a motion to dismiss that Bibliotek and BitTorrent did not access pirated libraries.  *Id*. (ECF No. 271 at 1; ECF No. 303 at 14).

107.    Copyright holders filed a lawsuit against Snowflake in 2025, alleging that RedPajama is a training database that "'contained within it a deduplicated copy' of Books3… '[a] dataset described in [the Pile paper as] derived from a copy of the contents of [] Bibliotek." *James v. Snowflake Inc.*, No. 2:25-cv-00108-BMM (D. Mont. 2025) (ECF No. 1 at 4).  Copyright holders there alleged that to "train [its] Arctic [models], Snowflake downloaded, copied, stored, and used the RedPajama dataset [that] contain[ed] Books3… and repeatedly … processed [] works during preprocessing and pretraining, and retained copies … on its servers for further training." *Id*. at 6.

108.    Copyright holders filed an action against Salesforce in 2025 for improperly training its artificial intelligence models on copyrighted works and relied on "notorious" datasets of pirated books to create its AI models. *Tanzer v. Salesforce Inc.*, No. 3:25-cv-08862-CB (N.D. Cal. 2025) ECF No. 1 at 1. Salesforce also used the same two datasets that Apple used, the RedPajama and the Pile, which "contain hundreds of thousands of copyrighted books that were acquired without the authorization or consent of

---

[7]  *Id*.

the authors." *Id*.

109.   Copyright holders filed an action against Microsoft in 2025 for copying "a notorious collection of approximately 200,000 pirated books known as 'Books3' and fed them its [Megatron] LLM." *Bird v. Microsoft Corp.*, No. 1:25-cv-05282 (S.D.N.Y. 2025) (ECF No. 7, at 2).   Microsoft also accesses The Pile and Bibliotik, the "'notorious pirated collection' of 'pirated books.'" *Id*. at 14.

110.   Consistent with its filing against Apple, Ted Entertainment filed lawsuits against NVIDIA and Amazon.   *Ted Entertainment, Inc. v. NVIDIA Corp.*, No. 5:25-cv-10287-EJD (N.D. Cal.); *Ted Entertainment, Inc. v. Amazon.com, Inc*., 2:26-cv-01134 (W.D. Wash. 2026).   Ted Entertainment alleged essentially the same claims filed against Apple, that NVIDIA and Amazon utilized its AI dataset models to access video files from YouTube by circumventing YouTube's TPMs.

111.   Multiple BIPA lawsuits were filed against other AI platform development corporations in 2026, including: *Basich v. Microsoft Corp.*, No. 2:26-cv-00422 (W.D. Wash. 2026); *Amer v. Eleven Labs Inc.*, No. 1:26-cv-05437 (N.D. Ill. 2026); *Marin v. Alphabet, Inc.*, No. 1:26-cv-05436 (N.D. Ill. 2026); *Marin v. Meta Platforms, Inc.*, No. 1:26-cv-05438 (N.D. Ill. 2026); *Delgado v. Meta Platforms, Inc.*, No. 3:23-cv-04181-SI (N.D. Cal. 2023); *Rogers v. NVIDIA Corp.*, No. 1:26-cv-05478 (N.D. Ill. 2026); *Dorcus v. Adobe Inc.*, No. 1:26-cv-05575 (N.D. Ill. 2026), and *Flowers v. Microsoft Corp.*, No. 1:26-cv-05491 (N.D. Ill. 2026).

112.   Defendants knew or should have known of this vortex of litigation targeting AI developers, all of which was widely reported.   Defendants were also on notice of the widely reported resolution of the *Concord I* case, which Anthropic paid damages of $1.5 ***billion*** to resolve after Judge Alsup on June 23, 2025, issued a summary judgment Order on Fair Use establishing Anthropic's potential liability for the "Pirated Library Copies."   The Court "denie[d] summary judgment for Anthropic that the pirated library copies must be treated as training copies," and set up a "trial on the pirated copies used to create Anthropic's central library and the resulting damages, actual or statutory (including for willfulness).

- 34 -

*Concord I*, No. 3:24-cv-05417-WHA (N.D. Cal.) (ECF No. 231 at 31-32).

113.    All Defendants were well aware that their unlawful business model involved Apple's violation of copyright laws long before the actions were filed against Apple.  As early as the October 2023 reported "removal" of the Books3 dataset "due to reported copyright infringement," Defendants knew that Apple was utilizing pirated library copies and would be subject to billions of dollars of damages.  These copyrighted materials were placed on the RedPajama or the Pile datasets, and both of these datasets still maintain the copyrighted materials downloaded from the Books3 dataset.

**G.    The Copyright Infringement and BIPA Class Actions Against Apple**

114.    Copyright and audiovisual intellectual property holders filed their initial class actions against Apple for copyright infringement on September 5, 2025 (*Hendrix*), and their second class action on April 3, 2026 (*Ted Entertainment*).

115.    The *Hendrix* lawsuit alleges that Apple undertook an "unauthorized reproduction of a 'Book3' dataset – which includes the Infringed Works – to train its OpenELM language models," "its Foundation Language Models," and Apple's unauthorized use of datasets that included copyright works for training.  *Id.* at ECF No. 1 at 13-14.  The *Hendrix* lawsuit states that:

> Apple is building [Apple Intelligence] using Books3, a dataset of pirated copyrighted books that includes the published works of Plaintiffs and the Class. Apple used Books3 to train its OpenELM language models. Apple also likely trained its Foundation Language Models using this same pirated dataset.

> Apple is building another part of its Apple Intelligence empire by using Applebot, a software program that copies mass quantities of webpages (also known as "scraping"). Apple scraped data with Applebot for nearly nine years before disclosing that it intended to train its AI systems on this scraped data. Scrapers like Applebot can also reach "shadow libraries" that host millions of other unlicensed copyrighted books, including, on information and belief, Plaintiffs' and Class Members' copyrighted works.

> The Foundation Language Models within Apple Intelligence depend on the contents of their training datasets. The Foundation Language Models operate by copying and later simulating creative expression found in copyrighted works. For this reason, the inclusion of expressive high-quality

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

material—especially copyrighted material—in Apple's AI training datasets is deliberate and commercially significant. For instance, to access even more copyrighted material to develop its valuable generative AI products, Apple entered into a multimillion-dollar licensing agreement with Shutterstock. But not with Plaintiffs or the Class.

Plaintiffs and the Class are authors who have registered copyrights for their published works. They did not consent to the use of their works in any Apple Intelligence model, including the Foundation Intelligence Models and OpenELM language models.

The licensing market for AI training data is burgeoning. Nevertheless, Apple did not compensate creators for use of their copyrighted works and concealed the sources of their training datasets to evade legal scrutiny. On information and belief, Apple continues to retain a private AI training-data library including thousands of pirated books to train its future models, without seeking Plaintiffs' or Class Members' consent or providing them compensation.

116.    On September 5, 2025, a Law360 report, *Apple Using Pirated Books To Train AI Models*, provided details about the allegations set forth in the *Hendrix* action[8]:

Apple is using unlicensed copyrighted works, including books from a controversial data set, in building its artificial intelligence models, two authors alleged in a proposed class action …. They claim Apple is building part of its new enterprise by using authors' copyrighted works, including their own, to train AI models "whose outputs compete with and dilute the market for those very works — works without which Apple Intelligence would have far less commercial value."

*****

The tasks, according to the lawsuit, include Apple's alleged unauthorized reproduction of a "Books3" dataset, which the authors say was a "data set of pirated copyright books," to train language models, and the unauthorized use of datasets that included copyrighted works for training. Hendrix and Roberson point to Apple's OpenELM, which the tech company announced in April 2024 as a "state-of-the-art open language model." The authors say a paper Apple published about the language model revealed that a large quantity of training data comes from a "books" subset of a dataset called "RedPajama."

---

[8] Rae Ann Varona, *Apple Using Pirated Books To Train AI Models, Authors Allege*, LAW360, Sept. 5, 2025.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

According to the authors, while the paper didn't further describe RedPajama's contents, information available elsewhere showed that its books component was a copy of Books3, a component of a separate AI training dataset called "The Pile" that was curated by EleutherAI.

The Books3 dataset has been central to **lawsuits** against other companies like Meta Platforms Inc.

*****

Hendrix and Roberson also point to Apple Intelligence "Foundation Language Models." The authors say a paper released in late July 2024 revealed it sources training data from licensed publishers, but also from publicly available or open-source datasets and information crawled from Apple's webcrawler, Applebot.

Apple's phrase "publicly available" is commonly used to "falsely conjure up the idea of works made publicly available by the author," the suit argues. In reality, it contends, the phrase means works that can be downloaded from the public internet, including copyrighted works by authors who haven't granted licenses for reproduction.

*****

As for Apple's use of Applebot, Hendrix and Roberson claim the company scraped data with the webcrawler for nearly nine years before disclosing that it intended to train its AI systems on the scraped data. The authors note that scrapers like Applebot are also able to reach "shadow libraries" that host "millions of other unlicensed copyrighted books," including theirs.

117. The *Ted Entertainment* lawsuit focused on Apple's violations of the Digital Millenium Copyright Act, 17 U.S.C. § 1201, arising from Apple "unlawfully circumventing technological protection measures to access and scrape millions of copyrighted videos from the online video viewing platform, YouTube, in order to feed, train, improve, and commercialize [Apple's] large-scale generative text-to-video [AI] model." The *Ted Entertainment* lawsuit articulates (ECF No. 29 at pp. 1-2):

YouTube allows the public to view audiovisual works only through controlled streaming, keeping its underlying video files locked away behind careful access restrictions.

YouTube does not provide public access to the underlying audiovisual works themselves, but instead delivers those works through a controlled streaming architecture that includes [TPMs] which require the application of authorized processes, including tokenized requests, segmented delivery protocols, and player-based reconstruction.

- 37 -

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

[Apple] published a peer-reviewed academic paper authored by its own researchers publicly disclosing that it trained Apple AI Video on Panda-70M—a dataset derived entirely from millions of YouTube videos that were themselves extracted from YouTube through circumvention of YouTube's TPMs.

[Apple] deployed tools designed to evade and circumvent YouTube's TPMs by deploying automated systems that replicated and manipulated authorized request flows while evading enforcement mechanisms, thereby gaining access to the underlying works in a form not available to the public and outside the conditions authorized by the copyright owner.

On information and belief, [Apple] used automated video-downloading programs combined with virtual machines that rotated IP addresses to avoid detection and blocking, enabling the mass unauthorized access and extraction of videos at the scale necessary to train Apple AI Video. [Apple] then used Plaintiffs' and Class Members' intellectual property for their own commercial gain in developing and commercializing Apple AI Video. In doing so, [Apple] has violated the law (and YouTube's Terms of Service), which were intended to protect Plaintiffs and others similarly situated.

By accessing, scraping, and downloading those files, [Apple] deliberately circumvented YouTube's access controls to obtain the training data necessary to build and commercialize Apple AI Video.

118.    Apple has also been subject to BIPA lawsuits since 2019, premised in part on an article distributed by Alex Hern at *The Guardian* on July 26, 2019.  The article, *Apple contractors 'regularly hear confidential details on Siri recordings*, provided inside information from an Apple whistleblower who, "expressed concerns about [Apple's] lack of disclosure, particularly given the frequency with which accidental activations pick up extremely sensitive personal information." "The whistleblower said: 'There have been countless instances of recordings featuring private discussions between doctors and patients, business deals, seemingly criminal dealings, sexual encounters and so on. These recordings are accompanied by user data showing location, contact details, and app data.'"  Soon after the article came out, Apple was sued by commercial voice persons and biometric identifiers for BIPA violations in class action lawsuits, in three actions: *Zaluda v. Apple Inc.*, No. 2019CH11771 (Cir. Ct. Cook Cnty., Ill 2019); *Lopez v. Apple Inc.*, No. 4:19-cv-04577-JSW (N.D. Cal. 2019); *Hazlitt v. Apple Inc.*, No. 3:20-cv-00421-NJR (S.D. Ill. 2020).

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

119.    In the *Zaluda* action, the plaintiff alleged that:

Apple collects, captures, stores and disseminates voiceprints of each individual who uses Siri. Apple does not inform Siri users prior to or after User Enrollment that it will capture, collect, store, and/or disseminate their voiceprints, and does not obtain Siri user consent to such capture, collection and storage of their voiceprints, as BIPA requires.

Additionally, Apple has not developed or made available to the public or implemented and complied with a written policy establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever occurs first, in violation of BIPA.

*****

Apple has used its privacy practices as a marketing tool to distinguish itself from competitors such as Google, Amazon, and Facebook that have been implicated in collecting, exploiting, and sharing sensitive customer data. For example, Apple has put up billboards stating "What happens on your iPhone stays on your iPhone." Apple's CEO Tim Cook has commented that Apple "believes privacy is a human right," and that "we also recognize that not everyone sees things as we do."

Despite positioning itself as a privacy leader, Apple — along with Amazon, Google, Facebook, and Microsoft — was recently revealed to have shared recordings made by Siri with contractors who then listened to the conversations for purposes of evaluating Siri's performance.10 The contractors regularly heard conversations where no wake phrase was uttered. These conversations included "private discussions between doctors and patients, business deals, seemingly criminal dealings, sexual encounters and so on." These recordings were accompanied by user data showing location, contact details, app data, and more, which could allow contractors to identify the users they were listening to. Apple had represented that any recordings made by Siri were completely anonymized.

*****

Apple refers to the voice data captured and collected from the Siri User Enrollment as a "User Profile." User profiles are voiceprints, and Apple has collected, captured, and stored the voiceprints of millions of Illinois consumers without acquiring informed consent in accordance with BIPA.

(Amended Class Action Complaint filed Dec. 23, 2019, at pp. 4, 13-15).

/ / /

/ / /

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

120.    Similar allegations in the *Lopez* action, which Apple agreed to settle in January 2025 for $95 million:

Siri is a purported artificial intelligence-based virtual assistant developed by Apple that allows individuals to use their voice to ask questions and receive answers based on information available on the internet and to give instructions for simple tasks that Siri executes. Apple preloads Siri on devices it manufactures, specifically laptops (MacBook), desktop computers (iMac), smartphones (iPhone), tablet computers (iPad), smart speakers (HomePod), music devices (iPod touch), headphones (AirPods), wearable devices (Apple Watch), and home entertainment devices (Apple TV) (collectively, "Siri Devices").

\*\*\*\*\*

Well aware of consumers' legitimate and reasonable expectations of privacy, Apple assured, and continues to assure, its customers, like Plaintiffs and members of the Class (defined below) ( "Class Members"), that Siri Devices will only listen to, record, and share their conversations with their consent, which can be given only: (i) by uttering an activation command, like "Hey, Siri" (the "hot word"); (ii) by manually pressing a button on the device; and (iii) in case of the AppleWatch, by raising the AppleWatch to one's mouth and beginning to talk. Consequently, individuals who have purchased or used Siri Devices and interacted with Siri have not consented to Apple recording or disclosing conversations where "Hey, Siri" has not been uttered and no button on the device has been pressed. 5. On July 26, 2019, unsuspecting consumers learned that despite Apple's assurances, Apple has intercepted, recorded, disclosed, and misused private conversations of thousands of individuals, including minors, without consent.1 As reported by *The Guardian*, Apple collected audio recordings of Siri users in numerous instances where a hot word is never spoken and used these recordings for its own commercial and financial benefit, namely to improve the quality of Siri voice assistant dictation. Worse, Apple disclosed these recordings to third-party subcontractors and/or affiliates without Siri Devices users' knowledge or consent. Each such recording and disclosure constitutes an egregious breach of social norms and is a violation of federal and state law.

Apple conceded — after the publication of *The Guardian* Article — that Siri "collects and stores certain information from [users' device]" and "relies on . . . audio recording of a [users'] request and a computer-generated transcription of it" to improve Siri's reliability.2 After admitting that Apple's conduct fell below "[its] high ideals," Apple announced the temporary suspension of its quality improvement program.3 Apple profited handsomely from this invasion of privacy by using the content of conversations which Apple obtains without consent or authorization to improve the functionality of Siri and thereby gain an advantage over

- 40 -

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Apple's competitors. As Apple has publicly admitted, improvements in Siri's speech recognition gave Apple an "incredible advantage" in the space. In short, Apple intentionally, willfully, and knowingly violated consumers' privacy rights, including within the sanctity of consumers' own homes where they have the greatest expectation of privacy.

(Second Amended Class Action Complaint, ECF No. 70, at pp. 1-3).

121. A more intense overall action was filed in 2026, *Lacour v. Apple Inc.*, No. 1:26-cv-05536 (N.D. Ill. 2026). The *Lacour* action focused on establishing liability for all of the CVMs, which extracted voiceprints from recordings from journalists, podcasters, audiobook narrators, and other performers who were not provided with the ability to consent to Apple's use of their voices to train Apple's commercial voice AI.

**H.      Materially False and Misleading Proxy Statements**

122. On January 11, 2024, Apple filed its annual Proxy Statement on Schedule 14A with the SEC (the "2024 Proxy Statement"). The 2024 Proxy Statement was authorized by each of the Director Defendants and was filed in connection with the 2024 stockholder meeting to elect all of the Director Defendants, among other things.

123. The Director Defendants in the 2024 Proxy Statement touted that they "are committed to responsibly advancing our products and services that use AI, have a robust approach to addressing ethical considerations across our business operations, and already provide resources and transparency on our approach to artificial intelligence and machine learning."

124. The Director Defendants disclosed that the Audit Committee had access to all of "Apple's privacy and data security risks. The Audit Committee receives regular updates from management, including Apple's Head of Information Security. Additionally, the Audit Committee reviews reports on privacy and data security matters from Apple's General Counsel, and from the heads of Compliance and Business Conduct, Business Assurance, and Internal Audit."

125. The Director Defendants also disclosed that:

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Apple also has a management Privacy Steering Committee chaired by Apple's General Counsel, with members including Apple's Senior Vice Presidents of Machine Learning and AI Strategy, Software, and Services, and a cross-functional group of senior representatives from Services, Software Engineering, Product Marketing, Corporate Communications, and Privacy Legal. The Privacy Steering Committee sets privacy standards for teams across Apple and acts as an escalation point for addressing privacy compliance issues.

126.    The Director Defendants, however, materially misled stockholders to believe that they were "committed to responsibly advancing our products and services that use AI, have a robust approach to addressing ethical considerations across our business operations, and already provide resources and transparency on our approach to artificial intelligence and machine learning."

127.    The 2024 Proxy informed stockholders that a "Proposal No. 7" had been made by the AFL-CIO Equity Index Funds to "request that Apple Inc. prepare a transparency report on the company's use of Artificial Intelligence ("AI") in its business operations and disclose any ethical guidelines that the company has adopted regarding the company's use of AI technology."  "In our view, AI systems should not be trained on copyrighted works, or the voices, likenesses and performances of professional performers, without transparency, consent and compensation to creators and rights holders. We also believe that AI should not be used to create literary material, to replace or supplant the creative work of professional writers."

128.    The Defendants, however, urged that stockholders vote against Proposal No. 7, making false and misleading statements about Apple's AI connections to copyright works:

We believe it's important to be deliberate and thoughtful in the development and deployment of artificial intelligence, and that companies think through the consequences of new technology before releasing it — something we've always been deeply committed to at Apple. Social issues raised in the proposal, like discrimination, bias, and privacy may be implicated by AI technologies, but are not unique to the application of AI.

*****

Apple's world-class machine learning and AI research team, led by our Senior Vice President of Machine Learning and AI Strategy, collaborates

- 42 -

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

with teams across Apple to drive breakthrough advancements in machine learning, and we have a dedicated Apple Machine Learning Research website where we provide meaningful visibility into our machine learning research and aim to make our products and services incorporating machine learning easy to understand.

*****

Our management Privacy Steering Committee sets privacy standards for teams across Apple and acts as an escalation point for addressing privacy compliance issues. The committee is chaired by Apple's General Counsel and its members include Apple's Senior Vice Presidents of Machine Learning and AI Strategy, Software, and Services, and a cross-functional group of senior representatives from across the business.

**The scope of the requested report is overly broad and could encompass disclosure of strategic plans and initiatives harmful to our competitive position**. This proposal addresses our use of artificial intelligence across our "business operations." The proposal does not focus on any specific novel use of AI at Apple and, in fact, references well-established applications of software such as automation of systems. Broadly defined, the requested report could encompass every aspect of our business, including whether and how we use automated systems in, for example, product development and research, supply chain management, financial management and planning, efficient management of energy use throughout our physical plant and buildings, monitoring of cyber and physical security at our facilities, coordinating employee benefit or other personnel programs, and conducting a wide range of other aspects of our business operations.

Beyond our business operations, due to its broad nature, the requested report would cover virtually every product and service Apple currently offers. To cite a few examples, Siri™, which has been available for more than a decade, Personal Voice and Live Voicemail included in iOS 17, and life saving features like Fall Detection, Crash Detection, and ECG, would simply not be possible without the use of artificial intelligence and machine learning. The broad scope of the proposal therefore speaks against preparing the report requested, especially as the proponent does not point to any specific use of AI at Apple that raises concerns. Not only would the report encompass every aspect of our operations and nearly every product or service we build, it could also cover competitively harmful disclosure of confidential research and development activities.

**The AI regulatory landscape is rapidly evolving**. Apple has been and will continue to be deliberate and thoughtful in the development and deployment of artificial intelligence. However, this proposal is premature in asking for a dedicated report when the landscape is just starting to emerge and regulators around the world are actively engaged in new rulemaking.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

129. On February 28, 2025, Apple filed its annual Proxy Statement on report on Schedule 14A with the SEC (the "2025 Proxy Statement")[9]. The 2025 Proxy Statement was authorized by each of the Director Defendants and was filed in connection with the 2025 stockholder meeting to elect all of the Director Defendants, among other things.

130. The Director Defendants in the 2025 Proxy Statement largely repeated their misleading misstatements, and suggested, falsely, that "We also believe privacy is a fundamental human right, and we are constantly innovating to protect people's data. This year, that meant setting a new standard for privacy in AI with Private Cloud Compute for Apple Intelligence — which extends our on-device setting to a new standard for privacy in Al with Private Cloud Compute for Apple Intelligence — which extends our on-device protections into the cloud. And we continue to share innovations that empower our users and protect their personal information protections into the cloud. And we continue to share innovations that empower our users and protect their personal information."

131. The Director Defendants also referenced their role in Apple AI and suggested that they had established "Responsible AI Principles": "Apple's full Board directly oversees corporate and product strategy and receives regular updates on emerging Apple technologies, including artificial intelligence. The Audit Committee assists the Board in its oversight of technologies, including artificial intelligence. The Audit Committee assists the Board in its oversight of privacy-related artificial intelligence matters. In June 2024, the Company announced its Responsible AI principles, which aim to guide how the Company develops artificial intelligence tools. The principles are available at: machinelearning.apple.com/research/introducing-apple-foundation-models."

132. The website referenced in, and thus included in, the 2025 Proxy Statement contained multiple false and misleading statements that the Defendants did not engage in copyright infringement,

[9] Available at: https://www.Apple.com/cc-shared/assets/investor-relations/pdfs/adbe-2025-proxy.pdf.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

which they actually did. *Introducing Apple's On-Device and Server Foundation Models* misled stockholders into believing that:

> Apple Intelligence is comprised of multiple highly-capable generative models that are specialized for our users' everyday tasks, and can adapt on the fly for their current activity. The foundation models built into Apple Intelligence have been fine-tuned for user experiences such as writing and refining text, prioritizing and summarizing notifications, creating playful images for conversations with family and friends, and taking in-app actions to simplify interactions across apps.
>
> In the following overview, we will detail how two of these models — a ~3 billion parameter on-device language model, and a larger server-based language model available with Private Cloud Compute and running on Apple silicon servers — have been built and adapted to perform specialized tasks efficiently, accurately, and responsibly. These two foundation models are part of a larger family of generative models created by Apple to support users and developers; this includes a coding model to build intelligence into Xcode, as well as a diffusion model to help users express themselves visually, for example, in the Messages app. We look forward to sharing more information soon on this broader set of models.
>
> **Our Focus on Responsible AI Development**
>
> Apple Intelligence is designed with our core values at every step and built on a foundation of groundbreaking privacy innovations.
>
> Additionally, we have created a set of Responsible AI principles to guide how we develop AI tools, as well as the models that underpin them:
>
> 1. Empower users with intelligent tools: We identify areas where AI can be used responsibly to create tools for addressing specific user needs. We respect how our users choose to use these tools to accomplish their goals.
> 2. Represent our users: We build deeply personal products with the goal of representing users around the globe authentically. We work continuously to avoid perpetuating stereotypes and systemic biases across our AI tools and models.
> 3. Design with care: We take precautions at every stage of our process, including design, model training, feature development, and quality evaluation to identify how our AI tools may be misused or lead to potential harm. We will continuously and proactively improve our AI tools with the help of user feedback.
> 4. Protect privacy: We protect our users' privacy with powerful on-device processing and groundbreaking infrastructure like Private Cloud Compute. We do not use our users' private personal data or user interactions when training our foundation models.

- 45 -

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

These principles are reflected throughout the architecture that enables Apple Intelligence, connects features and tools with specialized models, and scans inputs and outputs to provide each feature with the information needed to function responsibly.

In the remainder of this overview, we provide details on decisions such as: how we develop models that are highly capable, fast, and power-efficient; how we approach training these models; how our adapters are fine-tuned for specific user needs; and how we evaluate model performance for both helpfulness and unintended harm.

**Pre-Training**

Our foundation models are trained on Apple's AXLearn framework, an open-source project we released in 2023. It builds on top of JAX and XLA, and allows us to train the models with high efficiency and scalability on various training hardware and cloud platforms, including TPUs and both cloud and on-premise GPUs. We used a combination of data parallelism, tensor parallelism, sequence parallelism, and Fully Sharded Data Parallel (FSDP) to scale training along multiple dimensions such as data, model, and sequence length.

We train our foundation models on licensed data, including data selected to enhance specific features, as well as publicly available data collected by our web-crawler, AppleBot. Web publishers have the option out of the use of their web content for Apple Intelligence training with a data usage control.

We never use our users' private personal data or user interactions when training our foundation models, and we apply filters to remove personally identifiable information like social security and credit card numbers that are publicly available on the Internet. We also filter profanity and other low-quality content to prevent its inclusion in the training corpus. In addition to filtering, we perform data extraction, deduplication, and the application of a model-based classifier to identify high quality documents.

133.    The 2025 Proxy Statement informed stockholders that a "Proposal No. 4" requested that Apple prepare a report to "assess the risks … in the development and training of its artificial intelligence projects and implementation; unethical or improper usage of external data in the development and training of its artificial intelligence projects and implementation." "[S]takeholders are concerned developers will unethically or illegally extract from "off-limits" sources, such as from personal information collected

online, copyrighted works, and/or proprietary commercial information provided by users."[10]

134.    The Defendants responded with a false and misleading Report on Ethical AI Data and Usage, stating that "Apple has a strong track record on protecting user privacy and a robust approach to integrating ethical considerations into our technology, as reflected in our Responsible AI principles." "The requested report is unnecessary given Apple already provides all the information requested regarding Apple's AI data privacy practices." Defendants urged that stockholders vote against Proposal No. 4, making more false and misleading statements about Apple's AI connections to copyright works:

> At Apple, we believe it's important to be thoughtful and deliberate in the development and deployment of [AI], and that companies should consider the potential consequences of new technology before releasing it — something we've always been deeply committed to at Apple. We also believe that privacy is a fundamental human right and we have a strong track record on protecting user privacy in our products and services.[11]

135.    Defendants included the list of Responsible AI Principles set forth in the *Introducing Apple's On-Device and Server Foundation Models* website, also falsely stating:

> As described in our disclosures, we follow a strict data policy when developing our foundation models. No Apple user data is included in the training of the foundation models and we conduct legal review for each component in the training corpus. We perform safety filtering to reduce potentially harmful content, including certain personally identifiable information publicly available on the internet. And web publishers have the option to opt out of possible use for Apple Intelligence training, even if they prefer to continue being surfaced in search results within Siri and Spotlight. We also provide individuals with the ability to object to the processing of their personal data obtained on the web by Apple to train models that power Apple Intelligence features.
>
> We have also publicly described a number of privacy protections built into our integration of ChatGPT with Apple Intelligence. Users are in control over if and when ChatGPT is used to draw on broad world knowledge — they will be asked before their question is shared, and the answer will be presented directly. Users do not need a ChatGPT account to use the feature, and a user's IP address is obscured to protect against sessions being linked

---

[10] 2025 Proxy Statement, at 77.

[11] *Id.*, at 79.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

together. For users that are not logged into a ChatGPT account, OpenAI is not allowed to store their requests or generated responses, or to use them for OpenAI's own model training purposes. If a user chooses to log in or subscribe to ChatGPT, they can connect their ChatGPT account and their requests are covered by OpenAI's policies.

Notably, the proposal does not focus on any issues with Apple Intelligence. Instead, it focuses its criticism on OpenAI, the developer of ChatGPT, an independent service that Apple users may choose to access. The proposal also inappropriately cites lawsuits and controversies related to alleged copyright infringement by other companies that do not involve Apple.

Given our extensive disclosures covering precisely what the proposal requests, we believe that the requested report would be of no benefit to shareholders.[12]

136.    These statements were materially false and misleading and were made at a time when all Defendants knew or should have known that other AI developers had been sued by copyright and voiceprint holders for using datasets that included unlicensed materials and that the datasets were used by Apple.  At best, the Director Defendants acted negligently in making representations regarding Apple's practices given the copyright claims associated with the Books3 and the RedPajama dataset, circumvention of video files by Panda-70M from YouTube, and commercial voice products placed on Apple voice training datasets.

137.    On January 8, 2026, Apple filed its annual Proxy Statement on report on Schedule 14A with the SEC (the "2026 Proxy Statement").  The 2026 Proxy Statement, again authorized by each of the Director Defendants, conspicuously omitted the representations made in the 2024 Proxy Statement and the 2025 Proxy Statement that the dataset used to train the Company's AI products did not engage in copyright infringement.  The 2026 Proxy Statement again referenced the false and misleading statements on the *Introducing Apple's On-Device and Server Foundation Models* website.

138.    The Director Defendants' effective retraction of their prior representations regarding

---

[12] *Id*., at 80.

datasets used to develop their AI Models is a tacit admission that the dataset was decidedly not free from copyrighted and voiceprint materials at the time of the 2024 and 2025 Proxy Statements.

## I.        Share Repurchase Waste

139.    During the same time period that Apple was developing its AI datasets on Red Pajama, Common Crawl, and Panda-70M, the Board agreed to cause Apple to repurchase its own common stock at prices that were artificially inflated by the materially false and misleading statements and omissions in Apple's SEC filings.  In May 2024, the Board—while aware of the true extent of the Company's copyright and BIPA infringement on its AI platforms and datasets, and the false and misleading 2024 Proxy Statement—authorized a share repurchase program of up to $110 billion.  In May 2025, the Board—while aware of the true extent of the Company's copyright and BIPA infringement on its AI platforms and datasets, and the false and misleading 2025 Proxy Statement—authorized a share repurchase program of up to $221 billion.

140.     By September 27, 2025, just after the filing of the *Hendrix* action, Apple had repurchased approximately 201.8 million shares under this program for approximately $45 billion: (i) 35.697 million shares purchased at an average price of $224.11, 42.910 million shares purchased at an average price of $221.39, and 33.653 million shares purchased at an average price of $222.86 per share between June 30, 2024 to September 28, 2024; and (ii) 33.265 million shares purchased at an average price of $210.43, 28.986 million shares purchased at the average price of $224.25 per share, and 27.247 million shares purchased at the average price of $238.56 per share between June 29, 2025 to September 27, 2025.  All of these repurchases were made at times when the Defendants knew, but had failed to disclose, the Company's copyright and BIPA infringement on its AI platforms and datasets.  As a result, the Company paid artificially inflated prices to buy its own shares.

/ / /

/ / /

**DAMAGES TO APPLE**

141.    Apple is significantly damaged by Defendants' misconduct.  Defendants' failure to take required steps to eliminate copyrighted and voiceprint material from OpenELM, the Foundation Language Models, Apple AI Video, and CVMs will be subject to potentially massive liability from the copyright and BIPA infringement class actions.  This includes not only the potential costs to resolve the litigation, but also legal fees, loss of goodwill, reputational damage, and lost customers, among other things.

142.    Apple was further damaged by Defendants' failure to cause Cook to step down from his executive role as soon as Defendants were aware of Apple's copyright and BIPA violations.  This required action would have minimized potential damages to Apple, and also eliminated Cook's compensation in the collective amount of roughly $212 million in 2023-25.

143.    Apple was also damaged by spending nearly $45 billion to repurchase roughly 201.8 million of its shares at market prices artificially inflated by the false and misleading statements and omissions in SEC filings approved by the Director Defendants, amounting to a massive waste of corporate assets.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

144.    Apple is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

145.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of Defendants' wrongful conduct.

146.    Plaintiff is a current stockholder of Apple and has continuously owned Apple common stock at all times relevant herein.  Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

147. A pre-suit demand on the Board of Apple is futile and, therefore, excused. At the time this action was commenced, the Board consisted of the eleven Director Defendants: Cook, Levinson, Austin, Gorsky, Jung, Lozano, Sugar, and Wagner. As set forth below, the Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability for their wrong acts, such that demand on the Board to institute this action is excused as futile.

148. The Director Defendants, together and individually, violated and breached their fiduciary duties of loyalty and acted in bad faith. The Director Defendants knowingly approved and/or permitted the wrongs alleged herein and caused the Company to engage in copyright infringement and BIPA misconduct, authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to stockholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

149. The Director Defendants either knowingly or recklessly caused the Company to engage in copyright infringement and BIPA misconduct, and to issue the materially false and misleading statements alleged herein. The Director Defendants knowingly approved and/or permitted a business model to train Apple's AI products on a dataset that included copyrighted and voiceprint materials and knew of the falsity of the misleading statements in SEC filings at the time they were made. The Director Defendants thus face a substantial likelihood of liability and are not disinterested.

150. As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's operations and the material events giving rise to these claims. Specifically, as Board members of Apple, the Director Defendants knew, or should have known, the material facts surrounding the Company's copyright infringement and BIPA misconduct.

- 51 -
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

151.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures, and failed to make a good faith effort to correct the problems or prevent their recurrence.

152.    Defendant Cook was the CEO of the Company at relevant times and is not disinterested or independent. Cook led Apple into the AI era with the launch of Apple Intelligence in 2024. In a Wall Street Journal article on October 20, 2024, Cook praised Apple Intelligence and Apple's AI features, and disclosed that he used Apple Intelligence for tasks that have "changed my life." Cook falsely asserted to stockholders that "[w]ith Apple Intelligence, we are integrating AI features across our platforms in a way that is deeply personal, private, and seamless,"[13] and "Apple Intelligence avoids training on user data … [our m]odels use licensed content and synthetic datasets …. With independent audit confirming no data retention,"[14] which submits him substantially to the allegations of wrongdoing arising from many of the same events based on the same facts as alleged in this action, and the copyright infringement and BIPA actions.

153.    The Audit Committee Defendants (Lozano, Sugar, and Wagner) are not disinterested or independent, and therefore, are incapable of considering a demand because, pursuant to the Audit and Finance Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to the adequacy and effectiveness of technology security policies, internal controls regarding information and technology security, cybersecurity, and privacy related areas, compliance with related legal, regulatory and ethical requirements, and public disclosure requirements. The Audit Committee Defendants breached their fiduciary duties to the Company by permitting and facilitating Apple to conduct copyright violations and failing to prevent, correct, or inform

---

[13] Apple, Q3 2025 Apple Inc. Earnings Call, at 3 (July 31, 2025).

[14] Apple Magazine, *Tim Cook AI Journey to Apple Intelligence Features*, Nov. 2, 2025.

the Board of the issuance of material misstatements and omissions regarding the Company's copyright infringement misconduct and the adequacy of the Company's internal controls as alleged above. The Audit Committee Defendants therefore cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

154.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Business Conduct. The Code of Business Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Defendants to also adhere to Apple's standards of business conduct. The Director Defendants violated the Code of Business Conduct because they knowingly or recklessly engaged in and participated in making and/or causing the Company to engage in copyright infringement misconduct and make the materially false and misleading statements alleged herein. Because the Individual Defendants violated the Code of Business Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties and therefore demand upon them is futile.

155.    The Director Defendants' conduct was not the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As all of the directors face a substantial likelihood of liability, they are self-interested in the conduct challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the stockholders of the Company. Accordingly, demand is excused as being futile.

156.    The acts complained of herein constitute violations of fiduciary duties owed by Apple's officers and directors, and these acts are incapable of ratification.

/ / /

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

157.    The Director Defendants may also be protected against personal liability for their wrongful acts by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds—*i.e.*, monies belonging to Apple.  Any directors' and officers' liability insurance policy covering the Director Defendants will contain provisions that eliminate coverage for any action brought directly by the Company against its officers and directors, generally known as the "insured-versus-insured exclusion."  As a result, if the Director Defendants were to sue themselves or certain officers of Apple, there would be no directors' and officers' insurance protection.  Accordingly, the Director Defendants cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Defendants is futile and, therefore, excused.

158.    If there is no directors' and officers' liability insurance, then the directors will not cause Apple to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event as well.

159.    Thus, there is no majority of disinterested directors among the Director Defendants and demand is excused as futile.

### COUNT I
### Against All Defendants for Breach of Fiduciary Duty

160.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

161.    Defendants owed and owe Apple fiduciary obligations.  By reason of their fiduciary relationships, the Defendants owed and owe Apple the highest obligation of loyalty and care.

162.    The Defendants and each of them, violated and breached their fiduciary duties.

163.    The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  The Officer Defendants either

knew, were reckless, or were grossly negligent in not knowing that the Company and its statements concerning AI datasets were false and misleading. Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

164. The Director Defendants breached their duty of loyalty by permitting the improper activity concerning the copyright infringement misconduct. The Director Defendants knew or were reckless in not knowing that Apple's AI dataset process engaged in copyright infringement and BIPA misconduct. Accordingly, these defendants breached their duty of loyalty to the Company.

165. As a direct and proximate result of Defendants' breaches of their fiduciary obligations, Apple has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

166. Plaintiff, on behalf of Apple, has no adequate remedy at law.

## COUNT II
### Against the Director Defendants for Waste of Corporate Assets

167. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

168. The wrongful conduct alleged regarding the copyright infringement and BIPA misconduct and the false and misleading statements concerning AI dataset were continuous, and ongoing throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

169. As a result of the misconduct described above, the Director Defendants wasted corporate assets by, *inter alia*: (i) paying and collecting excessive compensation and bonuses; (ii) causing the Company to repurchase approximately 201.8 million shares of its common stock at artificially inflated prices; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the copyright infringement and BIPA class actions.

/ / /

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

170. As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

171. Plaintiff, on behalf Apple, has no adequate remedy at law.

### COUNT III
**Against the Director Defendants for Violations of
Section 14(a) of the Exchange Act and SEC Rule 14a-9**

172. Plaintiff incorporates by reference and re-alleges each allegation contained above as though fully set forth herein, except to the extent those allegations plead knowing or reckless conduct by the Director Defendants. This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to this claim.

173. SEC Rule 14a-9, promulgated under Section 14(a) of the Exchange Act, prohibits solicitation through a proxy statement or other communication "containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading." The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders that were contained in the Proxy Statements. The Proxy Statements contained proposals to the Company's stockholders urging them to re-elect the Director Defendants as members of the Board but misstated or failed to disclose the material information alleged herein.

174. By reasons of the conduct alleged herein, the Director Defendants are in violation of Section 14(a) and Rule 14a-9. As a direct and proximate result of Defendants' wrongful conduct, the

Company is misleading or deceiving its stockholders by making misleading statements that are an essential link in stockholders heeding the Company's recommendations to re-elect the current Board members up for election, approve the proposed executive compensation, and renew the contract of the outside auditor.

175.    Plaintiff thereby seeks injunctive and equitable relief because the conduct of the Director Defendants is interfering with Plaintiff's voting rights and choices at the annual meetings.

176.    This action was timely commenced within three years of the date of the Proxy Statements and within one year from the time Plaintiff discovered or reasonably could have discovered the facts on which this claim is based.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment in favor of Plaintiff and the Company and against all Individual Defendants as follows:

A.    Declaring and determining that Plaintiff may maintain this action on behalf of Apple and that Plaintiff is an adequate representative of the Company;

B.    Declaring and determining that the Defendants breached their fiduciary duties to Apple;

C.    Declaring and determining that the Director Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 by reason of the acts and omissions alleged herein;

D.    Determining and awarding to Apple the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

E.    Directing Apple and the Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Apple and its stockholders from a repeat of the damaging events described herein, including, but not limited to, actions as may be necessary to ensure proper corporate governance policies to strengthen the internal audit and

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

control functions and ensure the establishment of effective oversight of compliance with copyright laws and all other applicable laws, rules, and regulations;

F.    Awarding Apple restitution from Defendants, and disgorgement of any benefits wrongly obtained by Defendants;

G.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H.    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: August 14, 2026

BOTTINI & BOTTINI, INC.

By: */s/ Francis A. Bottini, Jr.*
        Francis A. Bottini, Jr.

Francis A. Bottini, Jr. (SBN 175783)
David T. Wissbroecker (SBN 243867)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Tel: 858-914-2001
Fax: 858-914-2002
fbottini@bottinilaw.com
dwissbroecker@bottinilaw.com

*Counsel for Plaintiff*

- 58 -
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## VERIFICATION

I, Phil Rosen, verify that I am a shareholder of nominal defendant Apple Inc. (the "Company"), and that I have continuously owned stock in the Company at all relevant times. I have reviewed the allegations in this Verified Stockholder Derivative Complaint (the "Complaint"). As to those allegations of which I have personal knowledge, I believe them to be true; as to those allegations of which I lack personal knowledge, I rely upon my counsel and counsel's investigation, and believe them to be true. Having received a copy of the Complaint and reviewed it with counsel, I authorize its filing.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 7-31-26

_____
Phil Rosen